UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


**Marco Garcia**

    **v.**                              Case No. 13-cv-086-PB
                                         Opinion No. 2014 DNH 250

**United States of America**


**MEMORANDUM AND ORDER**


Marco Garcia ("Garcia") was convicted in this court of conspiracy to distribute cocaine and to possess it with intent to distribute.  He was sentenced to 198 months in prison.  He now moves to vacate his sentence pursuant to 28 U.S.C. § 2255.  For the reasons that follow, I deny Garcia's motion.[1]


**I.   BACKGROUND**

**A.   Overview of the Conspiracy**

Garcia was convicted as a participant in an international drug conspiracy.  He was tried jointly with his cousin Ciro Garcia Lopez ("Lopez"), a coconspirator who was also convicted.  The First Circuit summarized the background of the conspiracy in

---

[1] In this Memorandum and Order, "Doc. No." citations indicate document numbers in this proceeding's docket.  "Trial Doc. No." citations, however, indicate document numbers in the docket of the underlying criminal proceeding against Garcia and the other members of the conspiracy, No. 09-CR-088-PB.

its decision rejecting Garcia's direct appeal:

> Lopez's cousin [and Garcia's half-brother], Juan Garcia Hernandez ("Hernandez"), was a New Hampshire cocaine dealer, who in 2007 formed a partnership with another dealer in the state, Renaury Ramirez Garcia ("Ramirez"). In the Fall of that year, the two sought a new source of drugs in Texas, where they met with defendant Lopez, who introduced them to a man known as "Molina." Molina later sent them several large shipments of cocaine, which Hernandez and Ramirez in turn sold to other dealers in New Hampshire, New York, and Massachusetts. Much of the drugs and the proceeds from the sales were stored in [the house of Janeth Sarmiento ("Janeth"), Hernandez's girlfriend and one of the coconspirators,] on Brown Avenue in Manchester, New Hampshire. [In addition to Janeth, the other residents of the Brown Avenue house included her father, Jose Cisneros ("Cisneros"), and her brother, Robert Sarmiento ("Sarmiento").]
>
> The partners were imprudent, however, and after too many sales of cocaine on credit they eventually owed Molina several hundred thousand dollars, a debt that led Ramirez to seek another source of cocaine that he could sell to pay off the debt. He found one right in New Hampshire and made a deal to buy ten kilograms of cocaine for $230,000. The source, however, was a government informant, and when Ramirez traveled to Manchester to get the drugs in March 2009, an undercover agent arrested him.
>
> As a consequence, Ramirez's girlfriend, Nicole Kalantzis, decided to cooperate with the government in order to obtain leniency for her boyfriend. In her new capacity, she met with Hernandez, who told her that a large shipment of cocaine would soon be delivered to New Hampshire, and that they had to sell it quickly because the "big guys" were coming to collect the money owed.
>
> On April 8, 2009, Lopez and Garcia arrived at the Brown Avenue house [in a white Ford pickup truck], followed four days later by a [tractor-trailer driven by one Adolfo Casas ("Casas")] carrying the cocaine. Soon after, the police videotaped Hernandez [and Casas] transferring cocaine from [the tractor-trailer onto the bed of the pickup truck. A short time later, the police videotaped

2

Hernandez and Cisneros moving the cocaine from the pickup
truck] into the trunk of a [white] Cadillac parked behind
the house, with Lopez standing 15 feet away, talking on a
cellphone.

    Later [on April 12, 2009], law enforcement officers
including a SWAT team executed a warrant to search the
house and arrested its inhabitants . . . Ledgers seized had
details of drug shipments and several references to Garcia
and Lopez.  Finally, after drug-sniffing dogs confirmed the
earlier surveillance evidence, the agents found a large
amount of cocaine in the Cadillac parked behind the house.

United States v. Lopez Garcia, 672 F.3d 58, 60-61 (1st Cir.
2012).  Garcia was arrested during the April 12, 2009 raid.
Following a four-day trial, he was convicted in April 2010 of
conspiracy to distribute cocaine and to possess it with intent
to distribute.

**B.   Evidence Against Garcia**

    The government produced a formidable body of evidence to
demonstrate Garcia's involvement in the conspiracy, including
the testimony of two coconspirators and an array of physical
evidence that corroborated the coconspirators' accounts.  This
evidence included:[2]

- Nine ounces of cocaine were found in the basement bedroom
  at the Brown Avenue house.  Other drug paraphernalia was
  also found on the table in the basement bedroom, including
  a heat sealer, a digital scale, packaging material, an

---

[2] This list is taken substantially from the government's citation
of evidence, which I requested during an August 2014 hearing.
See Doc. No. 25.

industrial-sized roll of wrapping material, and inositol.

- Drug ledgers were found in the Brown Avenue house.  These ledgers contained references to Garcia, including an entry reading "18,000 (Marco and Tomas)."

- After he was arrested, Garcia admitted to the police that he had arrived at the Brown Avenue house four days before the raid in a white Ford pickup truck.  Garcia claimed that he had traveled to New Hampshire to pick up a vehicle and drive it to Mexico, and he expected to receive $500 in payment for doing so.  Garcia could not, however, identify the vehicle that he was to drive back to Mexico.  Garcia admitted to the police that he had been sleeping in the basement bedroom where the cocaine was found the night before the raid.

- Janeth Sarmiento testified that she had first met Garcia in 2008 in Texas.  She testified that she would sometimes count drug proceeds with Hernandez, Ramirez, Garcia, and Tomas Cruz ("Cruz"), another coconspirator who reported to Hernandez.  Cruz and Garcia, she testified, would occasionally transport some of this money to Texas in the white Ford Mustang.  She also testified that Cruz and Garcia had transported ten kilograms of cocaine to New Hampshire in the white Ford Mustang in early March 2009.  She admitted, however, that she had learned of this delivery from Hernandez and that she never personally saw cocaine or money being placed into the Mustang.

- Janeth also testified that she had made certain entries in the drug ledgers found in the Brown Avenue house.  She testified that certain ledger entries pertained to Garcia and Cruz and that she had deposited money into both men's bank accounts at Hernandez's direction.

- On March 28, 2009, the same white Ford Mustang that Cruz and Garcia used to transport cocaine was stopped in Mississippi.  Police found eight kilograms of cocaine and five kilograms of heroin in the car.  Cruz was a passenger in the vehicle when it was stopped.  Police arrested Cruz

4

and found a water bill for Garcia and contact numbers for
Lopez and Hernandez inside his wallet.  The white Ford
Mustang was insured in the name of Garcia's wife, and
Garcia was listed as a permitted driver.

- Ramirez testified that he met Lopez in Texas in late 2007.
Lopez, Ramirez testified, planned to find another source of
cocaine for Hernandez and Ramirez.  He explained that he
and Hernandez arranged for cocaine to be transported to New
Hampshire from Texas.  In late 2008 or early 2009, 50
kilograms of cocaine were delivered to New Hampshire and
stored at the Brown Avenue house.  Ramirez took 35
kilograms of this shipment to Lowell, Massachusetts to
sell.  Proceeds from these sales were then brought back to
the Brown Avenue house and counted in the basement.

- Ramirez testified that he distributed ten kilograms of
cocaine to another person but never received payment.  He
testified that Garcia and Cruz brought ten kilograms to New
Hampshire to replace the ten kilograms he had lost.  The
ten kilograms brought by Garcia and Cruz were stored in the
basement of the Brown Avenue house.

- Finally, Ramirez testified that he would sometimes pick up
supplies of cocaine from Garcia at the Brown Avenue house.
He also testified that he would sometimes speak to Cruz or
Garcia if Hernandez was not available and that he would
sometimes count drug proceeds with Cruz and Garcia.

- After the police arrested Garcia, they found a State of
Texas document identifying him as the owner of the white
Ford Mustang inside his wallet.

- Telephone records listed hundreds of calls between numbers
associated with Hernandez and Garcia beginning on March 1,
2009.

C.  **Garcia's Defense**

Attorney Donald Kennedy represented Garcia at trial.

5

Garcia mounted a mere presence defense, claiming that he had only traveled to the Brown Avenue house to retrieve a used vehicle that he would then drive back to Texas and that he worked with Hernandez in a drywall business.  He denied any involvement with the drug conspiracy.  The following evidence presented at trial, the defense argued, substantiated Garcia's theory:[3]

- When the police raided the Brown Avenue house on April 12, 2009, Garcia was found in the kitchen, not in the basement bedroom.

- During the morning of April 12, 2009, and before they raided the Brown Avenue house, the police did not observe Garcia outside the house at all when they videotaped Hernandez, Casas, and Cisneros transferring the drugs between the tractor trailer, the white Ford pickup truck, and the white Ford Cadillac.

- Garcia's telephone records showed that he registered his cell phone under his own name and address and had used that phone for fourteen months.  An FBI agent testified at trial that this behavior was atypical of a drug dealer.

- Ramirez testified that the white Ford pickup truck, which Garcia drove from Texas to New Hampshire with Lopez, had a mount to tow other vehicles.  He also testified that Garcia had previously visited one of Ramirez's garages to install a towing mount to a vehicle.

---

[3] This list is taken substantially from Garcia's citation of evidence, which I requested during an August 2014 hearing.  See Doc. No. 28.

- After he was arrested, Lopez, like Garcia, told the police that he had come to New Hampshire to bring a vehicle back to Texas.

- A New Hampshire state trooper testified about his interview of another witness following the April 12, 2009 raid.  That witness told him that she had overheard Lopez talking about traveling to New Hampshire to retrieve a car.

- Casas testified that he transported money and drugs for Hernandez.  Casas also testified that Hernandez had said that Cruz worked for him.

- Janeth testified that Garcia and Hernandez had started a drywall business that at times generated significant revenue.  She also testified that the basement bedroom in the Brown Avenue house belonged to Sarmiento and that the heat sealer that the police found in the bedroom had been there before Garcia arrived at the house.

To impeach Ramirez, Garcia noted that Ramirez faced at least 20 years in prison but expected to receive a sentence of less than 10 years in exchange for his cooperation with the government.  Garcia also noted that Ramirez had not mentioned Garcia during his first two interviews with police and only mentioned him after police confronted him with evidence that he had lied to them about his gun ownership.  To impeach Janeth, Garcia noted that she had admitted at trial to cooperating with the government in an effort to help her father, Cisneros, who had already pleaded guilty when the trial began.

**D.   Procedural History**

Following his conviction in April 2010, Garcia appealed his conviction to the First Circuit, which rejected his arguments and affirmed his conviction in February 2012.  See Lopez Garcia, 672 F.3d at 60.  Attorney Joseph Wroblewski, Jr. represented Garcia on direct appeal.  Garcia then moved for a new trial in December 2012, which I denied in February 2013.  Trial Doc. No. 293.

Thereafter, in February 2013, Garcia filed a pro se motion under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence.  Doc. No. 1.  He claimed that his "sentence was imposed in violation of the Constitution or laws of the United States" on the basis of five separate errors.  Id.  In an order that I issued on October 25, 2013, I determined that I could "dispose of all but Garcia's first claim on the existing record."  Doc. No. 9.  Garcia's remaining claim alleged ineffective assistance of counsel caused by Kennedy's purported failure to either investigate four potential witnesses or call them to testify at trial.  Those witnesses included Sarmiento, Cisneros, Hernandez, and Cruz.[4]  Garcia's claim, I noted,

---

[4] Garcia also identified Casas as one such witness in one of his

8

"lack[ed] an evidentiary basis in the record."  Id.
Nevertheless, I agreed to give Garcia "an opportunity to
substantiate his allegations."  Id.  To that end, I scheduled an
evidentiary hearing and appointed attorney Robert Carey to
represent Garcia for the purposes of that hearing.  Id.

I conducted the evidentiary hearing on Garcia's ineffective
assistance claims on August 26, 2014.  Carey called Kennedy,
Sarmiento, and Garcia to testify at the hearing.  Carey did not
attempt to subpoena Cruz and instead offered an affidavit
describing a January 2014 telephone conversation between him,
his paralegal, and Cruz regarding Garcia's case.  Similarly,
Carey did not attempt to subpoena Hernandez and instead offered
an affidavit that Hernandez had signed to support Garcia's 2012
motion for a new trial.  Although Garcia had identified Cisneros
as a potential witness in his pleadings, Carey did not press
Garcia's ineffective assistance claim regarding Kennedy's
failure to interview or call Cisneros.

---

pleadings, but he did not develop any argument regarding Casas.
See Doc. No. 8.  In any event, Casas testified at trial and
therefore exposed himself to cross examination.

## II.   **STANDARD OF REVIEW**

To succeed on a claim of ineffective assistance of counsel, a criminal defendant must show both "deficient performance by counsel and resulting prejudice." Peralta v. United States, 597 F.3d 74, 79 (1st Cir. 2010) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)); see also Kimmelman v. Morrison, 477 U.S. 365, 382 (1986) (adopting the two-prong Strickland standard for claims of ineffective assistance of counsel on habeas review).  In order to satisfy the "deficient performance" prong of this standard, a petitioner must prove that his trial counsel's representation fell below "an objective standard of reasonableness." Pina v. Maloney, 565 F.3d 48, 54-55 (1st Cir. 2009); Owens v. United States, 483 F.3d 48, 57 (1st Cir. 2007). To establish prejudice, a petitioner must demonstrate "that, but for counsel's unprofessional error, there is a reasonable probability that the result of the proceeding would have been different." Yeboa-Sefah v. Ficco, 556 F.3d 53, 70 (1st Cir. 2009).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Sleeper v. Spencer, 510 F.3d 32, 39 (1st Cir. 2007).  Although a petitioner must satisfy both the deficient performance and prejudice prongs to prevail

on a claim of ineffective assistance, "a reviewing court need not address both requirements if the evidence as to either is lacking." Id.

### III.  ANALYSIS

Garcia alleges five errors that, he argues, warrant relief under § 2255: (1) Kennedy's failure to investigate and call as witnesses Sarmiento, Cisneros, Hernandez, and Cruz; (2) Kennedy's failure to properly impeach Janeth and Ramirez; (3) Kennedy's failure to investigate prosecutorial misconduct and witness tampering; (4) an alleged violation of the Confrontation Clause caused by Garcia's inability to cross-examine certain government witnesses; and (5) Wroblewski's failure to consult with Garcia when preparing his direct appeal and to raise meritorious issues on appeal. See Doc. No. 5.  Although none of Garcia's claims have merit, claim (1) requires more extensive treatment than Garcia's other claims.  I address each claim in turn.

### A.   Failure to Interview or Call Potential Witnesses

Garcia argues that both during and before trial, "Kennedy failed to investigate, call, and secure defense witnesses

[Cisneros] and Robert . . . . [despite being] instructed [by Garcia] to secure both . . . ." Doc. No. 1.  His memorandum of law alleges the same error regarding Hernandez and Cruz.  See Doc. No. 5.

### 1.   Robert Sarmiento ("Sarmiento")

Robert Sarmiento is the brother of Janeth Sarmiento. Although he lived at the Brown Avenue house when the police conducted the April 2009 raid, he was not charged in connection with the conspiracy.

Garcia claims that he instructed Kennedy to interview Sarmiento prior to the trial and to call him as a witness.  See Doc. No. 5.  Had Sarmiento testified, Garcia alleges, he would have testified that: (i) Garcia was uninvolved in the conspiracy; (ii) Garcia, on the few occasions when he traveled to New Hampshire, did so to purchase used vehicles at auction to transport back to Texas; (iii) Garcia had sometimes assisted Hernandez with a drywall business; and (iv) the basement bedroom at the Brown Avenue residence that Garcia was using when he was arrested in April 2009, and where police discovered a nine-ounce package of cocaine and other drug paraphernalia, belonged to Sarmiento.  See id.  Kennedy, Garcia claims, failed to either

12

interview Sarmiento or call him to testify at trial even though the government had included Sarmiento on its witness list.  See id.  That failure, Garcia contends, constitutes ineffective assistance.  See id.

Sarmiento testified during the August 2014 evidentiary hearing.  As Garcia predicted, Sarmiento stated that he had met Garcia twice before the April 2009 raid and that he had never seen Garcia participate in any drug-related activities, possess any drug-related paraphernalia, or discuss drugs with anyone. Nor, Sarmiento also testified, had he ever heard anyone discuss Garcia in connection with drugs.  He also testified that the basement bedroom belonged to him and that he generally had unimpeded access to it.   Finally, Sarmiento confirmed that Kennedy had never contacted him before the trial.

Importantly, however, Sarmiento also testified that he had not slept in the basement bedroom on the night before the raid. Somebody else, Sarmiento testified, used the bedroom that night, but he could not remember who that person was.  Moreover, Sarmiento denied both knowledge and ownership of the nine-ounce package of cocaine and other drug paraphernalia found in the bedroom.

In view of Sarmiento's testimony at the evidentiary
hearing, I need not address the reasonableness of Kennedy's
failure to interview or call him because it is clear that Garcia
was not prejudiced by the omission of Sarmiento's testimony.
Sarmiento's potential testimony consists of only a series of
vague and conclusory statements that align with, but do not
meaningfully strengthen, Garcia's mere presence defense.
Accordingly, any benefit that Garcia might have derived from
Sarmiento's testimony is outweighed by the formidable evidence
that the government offered against Garcia at trial.

    2.   Jose Cisneros ("Cisneros")

Cisneros is Janeth's father.  He also resided at the Brown
Avenue house when it was raided in April 2009.  He was arrested
for his involvement in the conspiracy and pleaded guilty in
January 2010.  He did not testify.

Garcia initially claimed that had Cisneros testified, he
would have corroborated other testimony establishing that Garcia
was not involved in the drug conspiracy.  See Doc. No. 5.
Garcia also claimed that Cisneros would have testified that: (i)
the April 2009 shipment of cocaine was placed in the Ford pickup
truck, and not the Cadillac, because the keys to the Cadillac

were unavailable when the shipment arrived; and (ii) Garcia was
not involved in the conspiracy and had traveled to New Hampshire
only to tow a vehicle back to Texas.  See id.

At the August 2014 evidentiary hearing, however, Garcia's
attorney abandoned the argument that Kennedy's failure to
interview or call Cisneros was ineffective.  In any event,
Garcia's ineffective assistance claim regarding Cisneros is
easily rejected.  Before the trial, Kennedy moved to compel the
government to immunize Cisneros, a remedy that would have
obviated Cisneros' Fifth Amendment privilege against self-
incrimination and rendered him available to testify at trial.  I
denied Garcia's motion after concluding that he had not
satisfied the standard for compelled immunization.  See Trial
Doc. No. 197.  In view of my decision, there was little else
that Kennedy could have done to secure testimony from Cisneros.
An attorney who does everything possible to achieve a favorable
outcome for a client is not, of course, ineffective simply
because those efforts do not succeed.  Thus, I reject Garcia's
ineffective assistance claim regarding Cisneros.

3.   Juan Garcia Hernandez ("Hernandez")

Hernandez is Garcia's half-brother and was one of the

15

principal partners in the conspiracy.  He was arrested during the April 12, 2009 raid for his role in the conspiracy, and he pleaded guilty in April 2010.  He did not testify.

Had Hernandez testified at trial, Garcia claims, he would have testified that: (i) Garcia had no knowledge of, or involvement in, the conspiracy; (ii) Garcia had traveled to New Hampshire only to pick up a used car and tow it back to Texas; (iii) Garcia did not transport ten kilograms of cocaine to New Hampshire in March 2009; (iv) Garcia assisted Hernandez with the drywall business "by opening a business bank account and paying the workers," (v) the white Ford Mustang belonged to Hernandez, but that Hernandez had instructed Garcia to insure the car under Garcia's name because neither Hernandez nor Cruz was licensed to drive in Texas; and (vi) none of the references to Garcia found in the ledgers were related to drugs.  See Doc. No. 5.

Attorney Carey chose not to subpoena Hernandez to appear at the evidentiary hearing.  To corroborate his claim of how Hernandez would testify, Garcia instead offered only an affidavit that Hernandez had signed on an unknown date to support Garcia's 2012 motion for a new trial.  In the affidavit, Hernandez attests, in relevant part, that: (i) he hired Garcia

and Lopez to transport two used cars from New Hampshire to
Texas; (ii) Garcia and Lopez arrived in New Hampshire on April
9, 2010 in a truck that they were going to use to transport the
two used cars to Texas; (iii) neither Garcia nor Lopez could
leave the following day because Hernandez had not yet received
the title certificate for one of the cars, and Garcia did not
want to travel without the car's "proper documents"; (iv) for
that reason, that Hernandez invited Garcia and Lopez to stay
with him over the Easter weekend until he could get the title
certificate on the following Monday; (v) neither Garcia nor
Lopez transported any cocaine or other contraband from Texas to
New Hampshire, and that they did not plan to transport any money
back to Texas; (vi) Garcia and Lopez were innocent of the
charges against them, and that they "were simply in the wrong
place at the wrong time"; and (vii) Hernandez "remained silent
on this matter during trial because [he] did not believe that
[Garcia] or [Lopez] . . . would be convicted when they were
actually innocent of the charges."  See Trial Doc. No. 291-1.

Garcia has not shown a reasonable probability that
Hernandez's testimony would have changed the outcome of his
trial.  First, as Garcia's half-brother, Hernandez has an

17

obvious motivation to lie and exculpate Garcia, particularly now that he has little to lose by doing so.  Second, Hernandez, as one of the principals in the conspiracy, would also be subject to damaging impeachment on cross examination by virtue of his criminal history.  Third, and like the probable testimony of the other witnesses Garcia has identified, Hernandez's testimony is cumulative of the mere presence defense that Garcia offered at trial.  Notwithstanding that defense, two witnesses – Ramirez and Janeth – both testified to Garcia's extensive involvement with the conspiracy.  Garcia has shown no reasonable probability that Hernandez's testimony would have persuaded the jury to accept his mere presence defense and reject the accounts of Ramirez and Janeth when it otherwise declined to do so.

Given the limited value of Hernandez's testimony, it is unlikely that Hernandez would have persuaded the jury to reject both the testimony of two coconspirators and a formidable body of physical evidence.  The Hernandez affidavit does not explain the references to Garcia in the drug ledgers, Garcia's ownership of the white Ford Mustang, the voluminous phone calls between Garcia and Hernandez, or the drugs and paraphernalia found in the basement bedroom.  Even taken at face value, the Hernandez

18

affidavit at most offers the jury a choice to believe either
Hernandez or, alternatively, Ramirez and Janeth.  Because the
physical evidence uniformly corroborates the accounts of Ramirez
and Janeth and because the Hernandez affidavit fails to even
address, much less explain, much of that evidence, there is no
reasonable probability that Hernandez's testimony would have
altered the outcome of Garcia's trial.  Thus, Garcia suffered no
prejudice caused by the omission of Hernandez's testimony, and
his ineffective assistance claim regarding Hernandez fails.

    4.   <u>Tomas Cruz ("Cruz")</u>

Cruz was an alleged member of the conspiracy.  At trial,
Janeth testified that Cruz sometimes counted drug proceeds with
Garcia at the Brown Avenue house and also sometimes transported
drugs and money with Garcia between Texas and New Hampshire.  On
March 28, 2009, the police stopped Cruz in Mississippi while he
was driving Garcia's white Ford Mustang.  The police searched
the car, found eight kilograms of cocaine and five kilograms of
heroin, and arrested Cruz.  Cruz pleaded guilty to involvement
in the conspiracy in March 2010 and did not testify at trial.

Garcia claims that had Cruz been called to testify at the
trial, he would have testified that: (i) Garcia was not involved

in the drug conspiracy; (ii) Garcia never transported any drugs with Cruz when they drove together from Texas to New Hampshire in the white Ford Mustang; (iii) police searched the Mustang during the early March 2009 trip from Texas to New Hampshire and found no contraband; and (iv) after that search, the police told Cruz that Garcia had to drive the Mustang only because Cruz was not licensed to drive.  See Doc. No. 5.

To corroborate this self-serving prediction of how Cruz would testify, Garcia offered only evidence of a January 13, 2014 telephone call between his attorney and Cruz.  See Pet'r's Ex. 3.  During that conversation, Cruz indicated, in relevant part, that Garcia was not present when Cruz was arrested in March 2009 – a fact that is not in dispute – and that Cruz had never discussed drugs with Garcia.  Cruz was not placed under oath during this conversation, however, and before ending the conversation, he told Garcia's attorney that he "[could not] give out any information on Marco Garcia's case and [did] not want to speak about Marco Garcia."  Pet'r's Ex. 3.  Moreover, Cruz declined to sign an affidavit drafted by Garcia's attorney verifying the substance of the conversation.  At the evidentiary hearing, counsel for Garcia said that he did not attempt to

subpoena Cruz to testify because he expected Cruz to invoke his
Fifth Amendment privilege.

At the evidentiary hearing, the government offered evidence
of statements that Cruz had made to DEA agents after his arrest,
including Cruz's assertion that Garcia had accompanied Cruz
during previous drug deliveries from Mexico to New Hampshire in
the white Ford Mustang.  See Pet'r's Ex. 5.  If Cruz had
testified that he had never discussed drugs with Garcia,
therefore, he would have exposed himself on cross examination to
damaging impeachment based on his prior inconsistent statements.
Although Garcia's counsel offered an explanation for those
inconsistent statements at the evidentiary hearing, the
inconsistency between Cruz's statements to the police and his
hypothetical testimony limits the value of Cruz's testimony to
Garcia's defense.

Even aside from its susceptibility to impeachment, Cruz's
hypothetical testimony would have added little to Garcia's
defense.  Garcia has not shown that Cruz would offer anything
more than a handful of vague and conclusory statements that are
cumulative of Garcia's mere presence defense.  Cruz's testimony
would serve only to rebut the contradictory testimony of Janeth

and Ramirez, both of whom testified to Garcia's extensive involvement in the conspiracy.  Cruz's testimony would not explain the damaging physical evidence that was introduced against Garcia at trial, including the drug ledgers, the drugs and paraphernalia found in the basement bedroom, Garcia's ownership of the white Ford Mustang, or the hundreds of phone calls between Garcia and Hernandez.  Against this body of evidence and the testimony of two other witnesses, Cruz could offer only his own dubious testimony that he had never discussed drugs with Garcia.  Garcia has not shown a reasonable probability that this testimony would have persuaded the jury to reject the evidence against him and, therefore, has not demonstrated any prejudice caused by the omission of Cruz's testimony.  Thus, I reject Garcia's ineffective assistance claim regarding Cruz.

**B.**   **Failure to Properly Impeach Government Witnesses**

Next, Garcia alleges that Kennedy was ineffective because he failed to "properly impeach" Sarmiento, Ramirez, and Cisneros.  See Doc. No. 5.  This claim finds no support in the record, which shows that Kennedy both impeached Sarmiento and Ramirez and sought to bolster Garcia's mere presence defense

during his cross examination of those witnesses.  Beyond his

conclusory assertion that Kennedy's cross examinations of those

witnesses were inadequate, Garcia does not identify any specific

fact that Kennedy should have elicited, or any specific question

that he should have posed, on cross examination.  Thus, I reject

Garcia's claim of ineffective assistance regarding Kennedy's

alleged failure to properly impeach either Sarmiento or Ramirez.

I also reject Garcia's claim regarding Cisneros because, as I

explained above, Kennedy did all that any attorney could be

expected to do in order to compel Cisneros' testimony.

C.    **Failure to Investigate Prosecutorial Misconduct**

     Garcia claims that Cruz "informed [Garcia] that the

prosecutor approached him and offered him a reduced sentence, if

he would testify falsely and according to instruction against"

Garcia.  Doc. No. 5.  Garcia argues that Kennedy was ineffective

by failing to further investigate prosecutorial misconduct or

witness tampering on the government's part.  See id.  Garcia,

however, offers nothing to corroborate his self-serving account

of what Cruz told him.  Even taken at face value, the

prosecutorial misconduct that Garcia alleges would not prejudice

him because Cruz did not testify against him at trial.  Although

Garcia argues that "[i]t is easily presumable" that the government also attempted to improperly influence other witnesses, that conclusory statement, without more, is insufficient to meet his burden for an ineffective assistance claim.  Doc. No. 5; see Cepulonis v. Ponte, 699 F.2d 573, 575 (1st Cir. 1983) ("[C]ounsel need not chase wild factual geese when it appears, in light of informed professional judgment, that a defense is implausible or insubstantial as a matter of law or, as here, as a matter of fact and of the realities of proof, procedure, and trial tactics.").  Thus, I reject this ineffective assistance claim as well.

**D.   Confrontation Clause Claim**

Garcia appears to argue that the government violated his rights under the Confrontation Clause by failing to present Cisneros and Hernandez as trial witnesses.  As for Cisneros, Garcia argues that "Cisneros . . . made statements against [him] and when compelled to be at trial for testimony, the Court sustained the Government's opposition."  Doc. No. 5.  That decision, Garcia maintains, deprived him of his right to confront Cisneros at trial.  See id.  Garcia's argument fails, of course, because Cisneros did not testify at trial, and the

government did not introduce any of Cisneros' statements to the police as evidence against Garcia.  The Confrontation Clause, therefore, simply has no bearing on Garcia's complaint with respect to Cisneros.

As for Hernandez, Garcia notes that Janeth was "allowed to testify at trial as to what Hernandez either told her or she over heard [sic] him say that [Garcia] had delivered 10-kilograms [sic] of cocaine with Thomas Cruz in a white Ford Mustang."  Doc. No. 5.  Because Hernandez did not take the stand at trial, Garcia argues, he could not cross-examine him even though the Confrontation Clause entitled him to do so.  See id. Although Janeth never testified to specific statements made by Hernandez, the trial record does suggest that Janeth learned of the ten-kilogram delivery at least partially from Hernandez and not solely from her own personal observation.  Even if her testimony regarding the delivery was based on Hernandez's out-of-court statements, however, admitting that testimony would not have violated the Confrontation Clause.  The Confrontation Clause attaches only to testimonial statements, and it is well established that "statements in furtherance of a conspiracy" are not testimonial.  Crawford v. Washington, 541 U.S. 36, 56

(2004); see also United States v. Malpica-Garcia, 489 F.3d 393, 398 (1st Cir. 2007) ("Statements made during and in furtherance of a conspiracy are not testimonial."). Thus, the Confrontation Clause neither prohibited Janeth's testimony nor entitled Garcia to cross-examine Hernandez, and Garcia's Confrontation Clause claim regarding Hernandez therefore fails on the merits.

**E.   Ineffective Assistance on Direct Appeal**

Garcia also faults his appellate counsel for failing to present his confrontation clause and prosecutorial misconduct claims on appeal.

To prevail on a claim of ineffective assistance by appellate counsel, a petitioner must show both that the attorney's decision to not raise a given issue on appeal was objectively unreasonable and that, but for the unreasonable failure to raise that issue, the appeal would have been successful. Smith v. Robbins, 528 U.S. 259, 285-86 (2000).

As I have explained, Garcia's Confrontation Clause and prosecutorial misconduct claims are meritless. Accordingly, counsel's failure to raise them on appeal cannot possibly justify an ineffective assistance of counsel claim.[5]

---

[5] Finally, to the extent that Garcia also faults appellate

## IV.   <u>CONCLUSION</u>

For these reasons, I deny Garcia's motion for relief under § 2255.  <u>See</u> Doc. No. 1.  Because Garcia has failed to make a substantial showing of the denial of a constitutional right, I also decline to issue a certificate of appealability.  <u>See</u> 28 U.S.C. § 2253(c)(2); Rule 11, Rules Governing Section 2254 and 2255 Cases in the U.S. Dist. Cts.; First Cir. LR 22.0.  The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

December 5, 2014

cc:   Marco Garcia, pro se
      Robert Carey, Esq.
      Donald Feith, Esq.

---

counsel for his failure to consult with Garcia, his claim fails because he cannot show that any failure to consult had any effect on his appeal.

27